**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

MACHINISTS DISTRICT 10,

                Plaintiff,

                                        **Case No. 07-C-364**

     -vs-

GE MEDICAL SYSTEMS, LLC,

                Defendant.

---

## DECISION AND ORDER

---

The plaintiff, Machinists District 10, originally brought this action before the Wisconsin Employment Relations Commission. District 10 alleges that GE Medical Systems, LLC ("GE")[1] violated its collective bargaining agreement by discharging and refusing to reinstate an employee, Yvonne Christianson. GE filed a timely notice of removal. District 10's prohibited practice complaint presents a federal claim that arises under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *See Oglesby v. RCA Corp.*, 752 F.2d 272, 277 (7th Cir. 1984).

Now before the Court are cross-motions for summary judgment. For the reasons that follow, GE's motion is granted, District 10's motion is denied, and this matter is dismissed.

---

[1] The WERC complaint alleges that General Electric Healthcare is the defendant, but the notice of removal alleges that the party to the collective bargaining agreement at issue is GE Medical Systems, LLC, and both parties have captioned their federal pleadings accordingly. However, in the defendant's proposed findings of fact, the defendant alleges that General Electric Healthcare was the signatory. This does not appear to be a material dispute between the parties, so the Court will refer to the defendant generally as "GE" to avoid confusion.

## BACKGROUND

GE develops, manufactures, sells and services a wide variety of medical diagnostic and other equipment, including X-ray, mammogram, computed tomography (CT) and magnetic resonance (MR) machines. GE was a signatory to a collective bargaining agreement with X-Ray Local Lodge 1916, District No. 10, International Associations of Machinists and Aerospace Workers, AFL-CIO.

Christianson was a member of the bargaining unit represented by District 10 and worked at GE's facility in Waukesha, Wisconsin. Christianson held the position of Group Leader, leading a group of Production Assemblers, and primarily working on CT Scanners. Prior to her discharge, Christianson had been employed by GE for approximately 32 years.

The products Christianson and her team worked on sell for $500,000 to approximately $1 million dollars. The CT scanners diagnose such health issues as coronary artery disease, tumor isolation, stroke perfusion studies and other anatomical imaging.

Depending on how many other Group Leaders were present on a given day, Christianson managed a group ranging from 6-24 people. She was responsible for allocating the right amount of resources to any given assembly line and assembly station to maximize productivity. Her job was to also inspect that gantries had no defects and was responsible for fixing those defects. The defects range from assembly errors to listening for abnormal bearing noise as any noise in the system would cause poor image quality or system aborts during scanning.

-2-

Christianson was also responsible for training new operators at varying assembly stations to broaden their knowledge and improve the flexibility of the workforce. She would also have to ensure that all paperwork is in compliance with FDA regulations, which consists of correct signatures and that all employees followed the necessary procedures to build and test the CT gantry. The correct performance of this job is critical to ensuring patient safety.

**August 7, 2006 incident**

On Monday August 7, 2006, Christianson was assigned to the first shift, rather than her normal second shift assignment, to work on inventory. Christianson lives in East Troy, Wisconsin, approximately a 40 minute commute from GE's Waukesha site. On the way in to work that day, Christianson played her Ford S-10 truck stereo loudly, with the window partially open. As she drove into work, she heard a noise coming from her car throughout the commute. She did not stop to check the source of the noise.

When Christianson arrived at the GE parking lot, she backed into a parking space so that the front end of her truck was facing out. No other cars were parked on either side of her at that time. She then inspected the truck and determined that one of the mud flaps was making contact with a rear tire. She pulled the mud flap away from the tire and in her opinion, fixed it so that it cleared the tire. She noticed no other unusual noises coming from her truck that morning.

Christianson then worked a full day on inventory, counting items and parts and reporting the count to another employee. This involved pulling boxes and parts of varying weights from storage and accurately counting and reporting. She had no difficulty in

-3-

performing that work, had no accidents or problems during the day and was able to work without supervision. The first shift ran from 6:00 a.m. to 2:30 p.m. with a half-hour lunch. Christianson had not worked the previous weekend.

Although her shift was scheduled to end at 2:30, Christianson left the building early and was in her vehicle in the GE parking lot by 2:18 p.m.. She did not have a designated parking spot and had no difficulty finding her truck. She sat in her car waiting until 2:30. While she waited, she smoked a cigarette, arranged her purse and listened to a Kid Rock CD, specifically the song "Fist of Rage" on her truck stereo. Her engine was not running and the driver's side window was rolled down. She did not leave the parking lot and instead waited and watched for other employees to leave the building so that she knew it was 2:30. She then recognized two males employees leaving the building, who she knew worked shifts that also ended at 2:30.

Christianson then pulled out of the parking spot and struck the vehicle parked next to her, owned by fellow employee Rich Medina. The impact ripped-off Medina's front bumper, causing body damage to the vehicle. Christianson heard a noise but did not get out of her car. Witnesses stated that after she struck Medina's car, Christianson stopped briefly, then pulled away. Christianson proceeded out of the GE parking lot, headed towards Highway T.

Christianson insists that she was unaware of this contact when she pulled out of the GE parking lot. According to Christianson, when she left her parking spot that afternoon, she popped the clutch of her truck. Christianson then felt her truck lurch forward, which she

-4-

thought was caused by the popping of her clutch. Over the sound of her stereo Christianson also heard a noise that sounded like the popping of the clutch. Christianson claims that she did not hear any noises, or feel any motions, that were out of the ordinary when compared to when she would start, and then pop the clutch of her car. Christianson would pop her clutch approximately 10 times per week, so she would not consider the moaning, grinding and groaning caused by the constant popping of her clutch. Consequently, Christianson asserts that she did not know that she had hit Medina's vehicle at the time she left the scene of the accident.

Christianson turned right onto Highway T and headed south, over I-94. While she was driving it, the truck pulled to the right. Christianson thought she had a flat tire, but she did not stop. She drove for approximately a mile until she reached a Mobil gasoline station at the intersection of Silvernail Road and Highway T in Waukesha.

When Christianson arrived at the gas station, she turned off the vehicle, got out and saw that her right front tire was flat and had gouges in it. She noticed no other damage to her car. She then drove next door to a Firestone tire station and had her tire replaced. That process took about an hour.

As Christianson drove home, she saw Rich Medina, the employee whose vehicle she had struck. Medina flagged her down as he was driving, yelled out the window to her and asked her to pull into a Pizza Hut parking lot. Medina said that Christianson had struck his car. Christianson did not challenge him, said she was sorry, that she knew she was parked next to him at GE, that he should get an estimate as to the damage and that she would fix it.

-5-

Christianson did not carry auto insurance for her truck.  Christianson eventually paid $500

directly to Medina and $1,500 to the Department of Motor Vehicles.  DMV paid Medina an

additional $1,000 to cover the damage to his vehicle.

After talking to Medina, Christianson drove home.  When she arrived at home, the

Waukesha Police Department called her and asked her to come to the police station.

Christianson's son also informed her that Wendy Muehls, Christianson's supervisor at GE,

had called about the collision.  Christianson did not call Muehls back, nor did she attempt to

reach anyone in management at GE at any point that day about the collision.  Instead,

Christianson drove to the police station that afternoon, spoke with a police officer and was

ticketed for hit and run.  She did not argue or challenge him about the ticket.  Christianson

eventually plead no-contest to the citation.  Christianson had no problems driving that day

and has not been in a car accident since that time.

## GE's Investigation

Shortly after Christianson struck Medina's car in the parking lot, Christianson's

manager, John Kempf (Business Leader for CT manufacturing) was contacted by Wendy

Muehls about the incident.  Kempf went to the parking lot and saw Medina's car.  Kempf

saw and heard the police interview two witnesses, Brian Hov and Jonathan Wojak.  Both

reported that they saw Christianson's car strike Medina's car, that she stopped briefly and

then pulled away.  Kempf also saw that GE's contracted security service, Wackenhut, was

on the scene and taking photographs of Medina's car.  Kempf then contacted the plant

-6-

manager as well as Fred Kingsley, GE's Manager of Labor and Employee Relations, to inform them of the incident.

The following day, August 8, 2006, Kingsley called Christianson into a meeting to question her about the incident. Christianson was represented by Leo Reisinger, Chair of the local Union as well as another Union official, Larry Nunley. Christianson admitted that she had hit Medina's car, but denied that she knew she had hit it when she left the GE parking lot. She told Kingsley that her mind was on other things that day and that she was in a hurry. Christianson also mentioned that she suffered from depression and was on medication for it. However, she told him that she had not taken any medication the previous day and that she was not having problems with the medication. Christianson stated that she was not under any medical restrictions, and that while she was tired at the end of the work day, it was a normal tired, and that she was not drowsy. At the conclusion of the meeting, Kingsley informed Christianson that she was being placed on suspension pending an investigation into the matter.

On August 17, 2006, Kingsley sent Christianson a letter informing her that a hearing would be conducted regarding her employment on August 23 at 9 a.m.. The hearing notice stated as follows:

> The Company finds that Ms. Christianson did indeed cause the vehicular accident that occurred on August 7th and that she left the scene of the accident without stopping or attempting to investigate what had just occurred. Given the extent of the damage (photos attached), the Company believes that Ms. Christianson had to have been aware of the accident.

-7-

The Union was also notified of that hearing. The following day, August 18, Kingsley received a voicemail message from Christianson, informing him that she had an emergency doctor's appointment on August 23 in the morning and asking that the meeting be rescheduled. Kingsley agreed to move the meeting to the afternoon.

Christianson saw her psychiatrist, Dr. Jeffrey Wilson, in the morning of August 23. Leo Reisinger, Union Chair, suggested that she go see him and get a note or letter from him about the incident. Christianson had last seen Dr. Wilson in June 2006 and missed an appointment in July with him. She had not rescheduled an appointment until Reisinger suggested that she go in.

At the appointment, Christianson told Dr. Wilson that she was going to be fired that day. She told him that she had hit a car in the parking lot and had left the scene. She asked him if the accident could have occurred because of the medication she was taking and she questioned whether the switch from second to first shift could have been a factor. He told her that it "could be." Christianson told him that she was feeling normal on the day of the collision and that she was having no problems with her medications. Christianson did not mention that she had been playing music loudly, or that she had popped the clutch on her car, causing it to stall. Dr. Wilson did not tell her to stop driving, did not change her medications and did not impose any restrictions on her after hearing of this incident.

Dr. Wilson then wrote a letter that same morning for Christianson. In his letter, Dr. Wilson described the medications Christianson took and stated that Christianson told him that she was unsure about the timing of medications given her switch from second to first

-8-

shift on August 7. In this letter, Dr. Wilson did not state that it was his opinion, to a reasonable degree of medical certainty, that the switch in shifts and/or her medications caused or contributed to the accident.

Christianson brought Dr. Wilson's letter to the hearing on the afternoon of August 23. Kingsley stated that GE's preliminary conclusion was that Christianson had damaged a vehicle and left the scene in violation of the following posted Work Rule:

- Stealing, misappropriating, or misusing property of Company or of other employees, or similar fraudulent acts.

Immediately preceding this Work Rule, in bold and capital letters, is the following statement:

**BREAKING ONE OF THESE RULES SHALL LEAD TO IMMEDIATE DISCHARGE**

Christianson was aware of these Work Rules, had seen them posted in the work place on information boards and was aware that violating this particular Work Rule would result in termination.

The Union then presented Dr. Wilson's letter. Kingsley asked questions about the timing of her medications. Kingsley stated that in his interview with Christianson on August 8, he had asked if she was having any problems that day, and that she had answered no. Union Chair Reisinger jumped in, did not allow Christianson to answer, and instead presented his research on depression. Reisinger is not a doctor and has no medical training.

The Union asked the Company to consider the letter from Dr. Wilson and to consult with a doctor before making a final decision. Neither the Union nor Christianson raised the

issue of Christianson popping her clutch and stalling her vehicle or loud music as the causes of the accident. Kingsley agreed to consult with another doctor and the hearing was adjourned without a final decision.

Kingsley then consulted with Dr. Joseph Zompa, M.D., GE's medical director. Dr. Zompa reviewed Dr. Wilson's letter, the information regarding the accident itself and his knowledge of Christianson through his interactions with her. Dr. Zompa told Kingsley that based on the fact that Christianson had demonstrated alertness and had no problems throughout the work day, that any change in her work shift had occurred recently and that the shift from second to first was not a significant change, it was his opinion that the shift change and medications was not a cause of the accident. Dr. Zompa told Kingsley that she would have to have been in a stupor for her not to realize that she had struck Medina's car.

**Discharge**

The hearing was reconvened on September 7, 2006. Kingsley informed the Union of Dr. Zompa's opinion. The Union objected that Dr. Zompa was not a specialist and that he was not qualified to give such an opinion. The Union also objected to the application of this Work Rule to this incident and stated that this was a civil matter only between Medina and Christianson. Kingsley disagreed and informed Christianson and the Union that the Company's investigation revealed that she had struck Medina's car and that she had knowingly left the scene in violation of Work Rules.

As in the previous two meetings regarding this incident, neither the Union nor Christianson raised the issue of Christianson popping her clutch and stalling her vehicle or

-10-

loud music as the causes of the accident. Accordingly, based on the Company's investigation, Christianson's employment was terminated immediately.

In making this decision, along with Christianson's manager, Kingsley consulted a document titled: "Seven Criteria for Sound Disciplinary Action." This document describes itself as: "The following seven point checklist will be helpful in determining whether an employee was properly disciplined." Included in the checklist are questions concerning whether the rule or order is reasonably related to the orderly, efficient, and safe operation of GE's business, whether GE made an effort to assure the employee did in fact violate the rule or order before administering discipline, and whether GE obtained substantial evidence or proof that the employee violated or disobeyed the rule or order. This document had been distributed to the Union leadership by the Company, but was not a part of the parties' collective bargaining agreement.

Kingsley concluded that the seven criteria had been met, in particular, the fact that no other employee, whether represented or not, had ever engaged in this type of conduct before. Kingsley also considered Christianson's 32 years of service to the Company, noting that she had been written up numerous times in recent years, including disciplines for poor/negligent work performance and repeated attendance violations.

-11-

District 10 grieved Christianson's discharge.[2] District 10 repeatedly argued to GE that

Christianson did not violate the above-stated Work Rule. District 10 also argued that GE

could not discharge Christianson for a private civil matter that it had no legitimate interest

in. The Company denied the grievance at each step of the grievance process. The grievance

procedure does not contain an arbitration provision.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and the moving party is entitled to judgment as a

matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of

proof at trial." *Celotex*, 477 U.S. at 322.

The substantive law in a section 301 suit for breach of a collective bargaining

agreement is federal common law rather than state law. *See Crider v. Spectrulite*

---

[2] The grievance procedure is described in the CBA as follows:

> In the event an employee, other than a probationary employee, has been suspended or
> discharged from employment for any reason, and he/she feels he/she has been unjustly
> dealt with, such suspension and discharge shall constitute a case to be handled in
> accordance with the Grievance Procedure. The steward shall be notified immediately
> at the time of the suspension or discharge. Should it be determined through the
> grievance procedure, that an injustice has been done with regard to the employee's
> suspension or discharge, the Company agrees to reinstate him/her with full seniority
> rights and pay him/her full compensation, at his/her hourly rate, for any time lost by
> the employee.

-12-

*Consortium, Inc.*, 130 F.3d 1238, 1242 (7th Cir. 1997). District 10 advances the application

of a traditional "just cause" standard to evaluate whether Christianson's discharge violated

the CBA. "Just cause is a flexible concept, embodying notions of equity and fairness." *Arch*

*of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of America*, 85

F.3d 1289, 1294 (7th Cir. 1996). For a penalty to be just "it must be in keeping with the

seriousness of the offense." *S.J. Groves & Sons co. v. Int'l Brotherhood of Teamsters*, 581

F.2d 1241, 1244-45 (7th Cir. 1978). One court endorsed the following jury instruction on

the definition of just cause:

> The term "just cause" means a real cause or basis for dismissal,
> such as may be contained in a company's policies, procedures,
> and contracts, as distinguished from an arbitrary whim or
> caprice; that is some cause or ground that a reasonable
> employer, acting in good faith in similar circumstances, would
> regard as good and sufficient basis for terminating the services
> of the employee.

*Lampkin v. UAW Local 1093*, 154 F.3d 1136, 1144 (10th Cir. 1998).

The CBA in this case says nothing about "just cause." Instead, it provides for

reinstatement when "an injustice has been done with regard to the employee's discharge..."

However, GE concedes that the general, federal common law standard for just cause should

be used in the context of deciding the pending motions. *See Lynchburg Foundry Co. v.*

*United Steelworkers of America*, 404 F.2d 259, 261 (4th Cir. 1968) (injustice covered

situation where company imposed unjustified dismissal or excessive discipline).

District 10 argues that the discharge was not for just cause because it was not related

to GE's interests in running its business. *See S.J. Groves*, 581 F.2d at 1244-45 (penalty

imposed by an employer is just only when the employee's conduct threatens the employer's legitimate concerns such as job safety, employee discipline and morale). However, GE clearly has an interest in ensuring that the parking lot it provides for its employees is safe, that its employees do not damage other employees' vehicles, and if they do so, that such accidents are reported. Whether Christianson was on-duty or off-duty at the time she struck Medina's car is irrelevant, as employees such as Christianson are usually coming and going in the parking lot at the beginning or end of their shifts.

The parties dispute whether Christianson knew that she hit Medina's car on August 7, 2006 before she drove away from the parking lot.[3] Christianson insisted, and continues to insist, that she did not know that she hit the car at that time, although her explanation for why she was unaware of the impact has shifted. Christianson no longer claims that she was impaired. Instead, Christianson now claims that her habit of popping the clutch on her truck distracted her at the moment of impact. Christianson did not advance this explanation at any of the steps in the grievance process.

However, when Christianson's conduct is evaluated against the just cause standard, the Court does not agree that the dispute over whether Christianson knew she hit Medina's car before she left the parking lot is material. GE based its decision to discharge Christianson on its own reasonable policies and procedures. GE disbelieved Christianson's explanation at the time it imposed discipline based upon the objective factors surrounding

_____

[3] District 10 admits that Christianson was aware that she hit Medina's car for purposes of its own motion for summary judgment, but denies this fact in opposition to GE's motion for summary judgment.

-14-

the incident. By doing so, GE had a reasonable basis for discharging Christianson and did not act in an arbitrary and capricious manner.

Nonetheless, even if Christianson's knowledge of the impact could be considered a material fact, the Court finds it simply unbelievable that Christianson did not know that she hit Medina's car when she left the scene of the accident, especially since she tore off Medina's bumper and caused approximately $1500 in damage. The severity of the impact, the undisputed fact that Christianson stopped her car briefly after hitting Medina's car, the undisputed fact that Christianson immediately and readily admitted fault after she was confronted by Medina, and Christianson's shifting explanations for why she was unaware of hitting Medina's car combine to render Christianson's explanation implausible.

The Court recognizes that it must view the disputed evidence in the light most favorable to the nonmoving party, and that evaluations of credibility are inappropriate at the summary judgment stage. *See Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). However, the Seventh Circuit recognizes certain "extreme" or "exceptional" cases where a "denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no occasion to submit the issue of knowledge to determination at a trial." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). The instant case fits into this exceptional category.

-15-

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.      GE's motion for summary judgment [D. 28] is **GRANTED**;

2.      District 10's motion for summary judgment [D. 21] is **DENIED**; and

3.      This matter is **DISMISSED**.   The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10th day of September, 2008.

                                        **SO ORDERED,**


                                        **s/ Rudolph T. Randa**
                                        **HON. RUDOLPH T. RANDA**
                                        **Chief Judge**